884 F.2d 579
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
ILLINOIS UNION INSURANCE COMPANY, Plaintiff-Appellee,
v.
HEINEMAN & LOVETT, INC., Defendant-Appellant.
 No. 88-1537.
 United States Court of Appeals, Sixth Circuit.
 Aug. 28, 1989.
 
 1
 Before KEITH and RALPH B. GUY, Jr., Circuit Judges, and THOMAS G. HULL, Chief District Judge.*
 
 
 2
 RALPH B. GUY, Jr., Circuit Judge. This case involves an attempt to determine liability for the damage to a building in Detroit caused by a fire on the evening of September 26, 1984. Plaintiff, Illinois Union Insurance Company, is a subrogee of the building's owner, who recovered for the damages under an insurance policy issued by plaintiff. Plaintiff alleged in this diversity action that the fire resulted from defendant's negligence in carrying out a renovation project in the building. A jury concluded that the defendant, Heineman & Lovett, had been negligent, but that this negligence was not the proximate cause of the fire. Plaintiff moved for judgment notwithstanding the verdict (JNOV) or for a new trial, the district court ordered a new trial, and the case again was tried before a jury. After this second trial, the jury returned a verdict in plaintiff's favor, and the defendant now argues on appeal that the district court improperly granted the motion for a new trial, that the court should have granted defendant's motion for a directed verdict in the second trial, and that the district court erroneously admitted "rebuttal evidence" proffered by plaintiff that was cumulative and prejudicial. Because we find no merit in any of defendant's contentions, we affirm the verdict in plaintiff's favor.
 
 I.
 
 3
 The building at the center of this dispute is one that was owned by the Detroit Lions, and in which the Lions maintained their offices before moving to suburban Detroit. The building remained vacant for some time before the owner of the Detroit Tigers, Tom Monaghan, agreed to buy it. The agreement came about in the fall of 1984, as Mr. Monaghan was intending to use the building as a site for world series parties.
 
 
 4
 Mr. Monaghan, with the permission of the Detroit Lions, began renovating before the sale was completed. Heineman & Lovett was hired to handle the renovations. The building was kept secure and was protected by an alarm system. Each day when work was to take place, defendant's employees would report to Tiger Stadium, where a stadium employee would give the keys to defendant's employees and call to have the security system shut off. The last Heineman & Lovett employee in the building at the end of the day would return the keys to Tiger Stadium and have the alarm activated.
 
 
 5
 The remodeling was fairly extensive, and defendant's workers were in the process of tearing up much of the carpet and padding, scraping paint from the walls, and repainting. The defendant intended to put all scrap materials (torn up carpet, paint scrapings) in a dumpster, but the defendant was unable to procure a dumpster at the time the renovating began. Defendant's employees put the scrap carpet and padding, along with trash bags full of paint fragments, in a large pile along two walls in the southern-most office in the building. There were two electric baseboard heaters in this office, located at the base of the walls where the scrap was stored.
 
 
 6
 The renovating proceeded for three days. At the end of the third day of work (September 26, 1984), one of defendant's employees, Bill Bliss, secured the building and set the alarm. Approximately six hours after Heineman & Lovett's employees left the building, a fire was discovered in the southern-most office of the building. The fire department responded to the blaze and, after knocking in the southern door, was eventually able to contain the blaze. At no time during the evening did the security alarm at the building ever go off.
 
 
 7
 The Detroit Lions filed a claim under their insurance policy with Illinois Union, and Illinois Union paid the Detroit Lions for the damages caused by the fire. Standing as subrogee of the Detroit Lions, Illinois Union filed this suit against Heineman & Lovett.
 
 
 8
 At trial, plaintiff attempted to establish that the fire occurred when the baseboard heater along the southwest wall, which had been completely covered by carpet remnants and paint scrapings, ignited the scrap. Through the testimony of Heineman & Lovett employees, Illinois Union was able to establish that the defendant negligently placed the carpet scraps and other rubbish on top of the heater. While there was some evidence that the heater caused the fire, the plaintiff was unable to produce enough direct evidence to establish definitively that the heater was the cause. Therefore, the plaintiffs also relied on circumstantial evidence, adduced through the testimony of many witnesses and the presentation of numerous exhibits, to eliminate the possibility that the fire could have resulted from any other source. Plaintiff presented the testimony of two fire experts who opined that the fire clearly did not appear to have been set by an arsonist. There were no signs of forced entry, lab tests showed absolutely no trace of any accelerant, and the heavy soot pattern was typical of a fire that smolders for a long period and gradually builds up, rather than of an arson fire with an accelerant and an instant fire. Both fire experts also testified that the burn damage and smoke pattern (which formed a "V" extending from the corner where the heater was located) suggested that the fire originated from the baseboard heater.
 
 
 9
 Plaintiff witnesses also testified that the circuit controlling the heater was in the "tripped" position, which was consistent with the theory that the heater was energized at the time of the fire. Illinois Union's experts noted that the carpet being piled on top of the heater would likely prevent the thermostat control from functioning properly. Normally, the heater would kick on only when the room temperature dropped below a level set by the thermostat, and turn off when the temperature in the room reached the thermostat setting. With carpet piled on the heater, however, all of the hot air produced by the heater would be trapped in the carpet, meaning the room air would stay cool and the mechanism in the thermostat to turn off the heater would never be triggered. This type of continued exposure to heat could also serve to lower the ignition point of the carpet heaped on top of the heater. Finally, plaintiff's witnesses recognized that the heaters were equipped with automatic shut-off devices, called over temperature limit (OTL) switches or Wilcolator switches, that were designed to automatically shut down the unit when the air temperature exceeds 285 degrees. After the fire, this switch was found in the "open" position, as it should be when attempting to shut down the heater, but plaintiffs argued that there was no way to tell whether the switch opened at the correct time, or whether it merely opened in response to the extreme heat of the fire. (The switch was melted in the fire, so it could not be tested). The plaintiff's witnesses also noted that the heating element within the heater would normally achieve a temperature in the 500 to 600 degree range before the air temperature would reach 285 degrees.
 
 
 10
 After denial of its motion for a directed verdict, Heineman & Lovett presented its case, in which it attempted to establish that the heater could not have caused the fire, and that it is possible the fire was arson. Two mechanical experts testified that the Wilcolator switch would have prevented the heater from reaching a temperature above 285 degrees. These experts also opined that the heater did not bear any evidence of having reached an abnormally high temperature. The defense also stressed that while the tripped circuit noted by the plaintiff might suggest that the heater was on, many other, unrelated occurrences could have tripped the circuit.
 
 
 11
 In order to suggest that the fire could have been caused by something other than the heater, the defendant offered the testimony of one witness, Jack Hughes. Hughes was a private investigator who surveyed the fire scene and completed his report shortly after the fire, but who did not reach the conclusion that the fire was the result of arson until just before trial. Hughes suggested that the fire was set by someone who gained access to the premises and poured an accelerant on the laid carpet in the middle of the room. Hughes admitted that he never found any trace of an accelerant. Nevertheless, he pointed to different fire patterns and smoke damage than plaintiff experts had and said these factors supported his theory.
 
 
 12
 The jury found that defendant had been negligent, but that this negligence had not been the proximate cause of the fire. Because he determined that this result was against the great weight of the evidence, the district judge granted plaintiff's motion for a new trial. The judge noted that the plaintiff had amply supported its case, albeit with circumstantial evidence, while the defendant never established that the heater could not have caused the fire or that arson was a real possibility.
 
 
 13
 At the second trial, plaintiff submitted much the same evidence in its case in chief as at the first trial. However, the plaintiff did offer the deposition testimony of an additional witness, Randall Bills, who had examined and performed tests on the suspect heater. While Bills could not definitively say that the heater caused the fire, or that the Wilcolator switch had malfunctioned, he concluded that the heater certainly could have caused the fire and that, in his opinion, the most likely scenario was that the Wilcolator switch malfunctioned and the heater did cause the fire.
 
 
 14
 After unsuccessfully moving for a directed verdict, the defendant presented the same witnesses and approximately the same evidence as at the first trial. However, one key witness for the defense significantly added to his testimony. Engineer Eugene Klingler repeated his testimony that the Wilcolator switch was in the position one would have expected if it had operated properly, and that there was no physical evidence inside the heater to suggest that the heater had reached abnormally high temperatures. Klingler strengthened Heineman & Lovett's case, however, by adding an explanation of "Poisson's Law." According to Klingler's explanation of this physical law, the temperature at the outside of a closed surface cannot get any hotter than the inside. Since evidence suggested that the carpet needed a temperature approaching 878 degrees to ignite, this temperature could not have been reached without the heater, which was inside of the carpet, first having reached this temperature. Klingler testified there was no physical evidence indicating the heater had reached such an extreme temperature.
 
 
 15
 The defendant renewed its motion for a directed verdict, which the court again disallowed. The court noted that the defendant had still offered only witness Hughes to prove a cause for the fire other than the heater, and the court labeled Hughes' theory "fatuous" and "off the wall."
 
 
 16
 Illinois Union sought to introduce expert testimony to rebut Klingler's testimony and, over the defendant's objection that such testimony would be cumulative, the court allowed mechanical engineer Robert Hume to testify in rebuttal. Hume testified first that he had heard of "Poisson's Law," but that to his knowledge it was an engineering concept that he had never heard applied to thermodynamics. Additionally, Hume added influential testimony that suggested the heater, which normally operates as a convection heater, could actually have operated more like a radiant heater in this instance. Hume explained the concept of radiant heat by reference to the example of sunburn on a winter day--the circulating air stays cool, but the rays of radiant heat are strong enough to burn the skin. Hume proposed that a metal piece separating the heating element from the Wilcolator switch could have reflected radiant heat away from the switch. Thus, the carpet was absorbing this radiant heat, and getting hotter and hotter, while the air circulating around the carpet was not absorbing the radiant heat. In this way the carpet could conceivably have reached the ignition point without the heater, and its Wilcolator switch, ever having malfunctioned.
 
 
 17
 The case was submitted to the jury, and the jury found that Heineman & Lovett was negligent, and that this negligence was the proximate cause of the fire. The parties stipulated as to damages. Without moving for a new trial or for judgment notwithstanding the verdict, the defendant filed this appeal.
 
 II.
 
 18
 On appeal, the defendant first argues that the district court erred in granting Illinois Union's motion for a new trial after the jury returned a verdict in defendant's favor. Defendant argues that it offered sufficient evidence to support its case, while the plaintiff relied on mere circumstantial evidence, so the judge erred by impermissibly substituting his own judgment for that of the jury. Duncan v. Duncan, 377 F.2d 49 (6th Cir.1967). We cannot accept the defendant's argument.
 
 
 19
 This court is hesitant to overrule a district court's decision on a motion seeking a new trial under Fed.R.Civ.P. 59.
 
 
 20
 Generally, the grant or denial of a new trial is purely within the discretion of the trial court and will not be reversed except upon a showing abuse of discretion. Whittington v. New Jersey Zinc Co., 775 F.2d 698 (6th Cir.1985); Gordon v. Norman, 788 F.2d 1194 (6th Cir.1986). Abuse of discretion is defined as a definite and firm conviction that the trial court committed a clear error of judgment. Balani v. Immigration and Naturalization Service, 669 F.2d 1157 (6th Cir.1982).
 
 
 21
 Logan v. Dayton Hudson Corp., 865 F.2d 789, 790 (6th Cir.1989). After the district court has granted a new trial, based on a determination that the jury's verdict was not supported by the weight of the evidence, this court, on review, resolves all disputes and makes all inferences in support of the order for a new trial. "The order will not be reversed if the record discloses any tenable ground in support of the order." Trice v. Commercial Union Assurance Co., 334 F.2d 673, 677 (6th Cir.1964), cert. denied, 380 U.S. 915 (1965), citing Turner v. United States, 229 F.2d 944, 945 (6th Cir.), cert. denied, 351 U.S. 970 (1956). In this case, although the plaintiff was unable to offer direct evidence that the heater started the fire, there was enough circumstantial evidence supporting this theory to justify the judge's decision to grant a new trial.
 
 
 22
 In this argument, as in others, the defendant miscomprehends the nature of plaintiff's proofs by focusing undue attention on plaintiff's inability to offer direct proof conclusively establishing that the heater started the blaze. The plaintiff recognized this problem and focused instead on proving that no instrumentality other than the heater could possibly have caused the fire. The district court was persuaded by plaintiff's strong proof in this regard, and unpersuaded by the defendant's one witness who offered a highly speculative arson theory, so the decision to grant a new trial was certainly supported by plaintiff's proofs.
 
 III.
 
 23
 Defendant's second argument on appeal relates to the district court's refusal to grant its motion for a directed verdict, raised after the close of plaintiff's case and again after the defendant completed offering its evidence. In an argument similar to that made in objecting to the grant of a new trial, defendant asserts that the plaintiff failed to present evidence sufficient to justify a jury decision in its favor, so the district court erred in allowing the case to be submitted to a jury.
 
 
 24
 In diversity cases, this circuit adheres to the minority rule that state law governs the standard for granting motions for directed verdict. Fitzgerald v. Great Central Ins. Co., 842 F.2d 157, 159 (6th Cir.1988); Lewis Refrigeration Co. v. Sawyer Fruit, Vegetable and Cold Storage Co., 709 F.2d 427, 430 n. 3 (6th Cir.1983). In Michigan, a court ruling on a motion for a directed verdict
 
 
 25
 must view the evidence in a light most favorable to the plaintiff and determine whether the evidence establishes a prima facie case against the defendant. The motion should be granted only when there is no question for the trier of fact, i.e., where all reasonable men would agree that there has been an essential failure of proof.
 
 
 26
 Central Soya Co., Inc. v. Rose, 135 Mich.App. 180, 183, 352 N.W.2d 727 (1984). To accept defendant's argument, this court would thus have to find that there was no way a reasonable jury, looking at the plaintiff's evidence, could have found in plaintiff's favor.
 
 
 27
 This court cannot adopt the defendant's interpretation of the evidence. The defendant fails to appreciate the fact that plaintiff's inability to offer decisive direct evidence that the heater caused the fire does not doom plaintiff's case. The jury could quite properly have relied on plaintiff's strong, though circumstantial, evidence to infer that the heater caused the fire. This inference is especially strong, as the district court noted, as a result of defendant's inability to prove arson as an alternative cause. In similar cases, where defendants move for directed verdicts (pre-verdict) or for JNOV or a new trial (post-verdict), in the face of circumstantial evidence establishing the cause of a fire, Michigan courts have denied the motions. See Firemens Mutual Ins. Co. v. Muskovitz & Pershin & Sons, Inc., 32 Mich.App. 566, 189 N.W.2d 85 (1971). Denial of defendant's motion for a directed verdict was proper.
 
 IV.
 
 28
 Defendant next argues that the district court erred in denying defendant's motion, under Federal Rule of Evidence 403, to exclude plaintiff's rebuttal evidence as cumulative. We are not persuaded by defendant's position, as there was no error committed that would justify reversal of the verdict.
 
 
 29
 As an initial matter, most of the rebuttal witness' testimony was not cumulative, but was proper rebuttal. The witness (Hume) directly responded to defendant witness Klingler's testimony that the heater could not have caused the fire by questioning whether "Poisson's Law" was properly applicable to thermodynamics, and suggesting that even if "Poisson's Law" did apply, the heater could have caused the fire by radiant heat. This was not merely a repetition of earlier testimony.
 
 
 30
 As a second issue, even if we assume, arguendo, that Hume's testimony was cumulative, defendant never suggests how this repetitive testimony possibly prejudiced its case. Rule 403 prohibits the "needless presentation of cumulative evidence" primarily to avoid the wasting of time, but the wasting of judicial time normally does not prejudice one side or the other. This court cannot presume that because arguably cumulative evidence was admitted, prejudice has occurred, and the defendant has offered no explanation as to how the cumulative aspects of Hume's testimony adversely affected its case.
 
 V.
 
 31
 As a final point on appeal, defendant argues that the jury's verdict should be overturned because it is against the great weight of the evidence. However, this court has long held, as a procedural matter, that objections based on the sufficiency of the evidence are waived unless a party first raises the objections in a post-trial motion for JNOV or a new trial. Young v. Langley, 793 F.2d 792, 794-95 (6th Cir.), cert. denied, 479 U.S. 950 (1986); American National Bank & Trust Co. v. Dean, 249 F.2d 82, 83 (6th Cir.1957). Because the defendant never made a post-trial motion for JNOV or a new trial, this court may not now consider defendant's claim that the jury verdict was based on insufficient evidence.
 
 
 32
 The decision of the district court is AFFIRMED.
 
 
 
 *
 The Honorable Thomas G. Hull, Chief Judge for the Eastern District of Tennessee, sitting by designation